## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 25-cv-1673**

THE ESTATE OF STEVEN BACHAR
by and through its Personal Representative Susan Bachar;
EMILY BACHAR;
SARAH BACHAR

      Plaintiffs,

v.

JERRY WILLIFORD;
SILMARA DOS SANTOS;
ERIN HANNESSON RUARK

      Defendants.

---

## CIVIL RIGHTS COMPLAINT WITH REQUEST FOR TRIAL BY JURY

---

Plaintiffs Estate of Steven Bachar, through its personal representative Susan Bachar, Emily Bachar, and Sarah Bachar, by and through, HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC, complain against Defendants and request a trial by jury as follows:

## I. INTRODUCTION

1. Steven Bachar was a 58-year-old inmate at the Rifle Correctional Center, who died in March 2024 as a result of Defendants' deliberate indifference to his known serious medical needs.

2. While incarcerated at Rifle Correctional Center ("RCC"), Mr. Bachar's repeated pleas for emergency medical care were wholly disregarded by medical staff.

3. RCC medical staff, including Defendants, knew Mr. Bachar was at high risk for a heart attack or other major cardiac event.

4.  On March 12, 2024, Mr. Bachar declared a medical emergency because of his symptoms that indicated a cardiac crisis. However, despite repeated requests for help, multiple complaints of persistent, emergent cardiac symptoms, abnormal EKG, and abnormal lab results, his obvious cardiac emergency went entirely ignored and untreated.

5.  Predictably, another inmate found Steven Bachar slumped over and unresponsive in his cell four days later, on the morning of March 15, 2024. He died of heart complications, entirely predictably and preventably, after days of asking for care.

6.  Mr. Bachar's worsening heart condition and ischemia would have been detected, and his death prevented, if he had been sent to the hospital.

## II.  JURISDICTION, VENUE, AND NOTICE

7.  This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988. The jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 1367, 2201, and 2202.

8.  This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred.

## III.  PARTIES

9.  At all times relevant hereto, the decedent, Steven Bachar, was a citizen of the United States and a resident of the State of Colorado.

10. The Estate of Steven Bachar was opened in Garfield County, where Steven Bachar died. Susan Bachar is the duly appointed personal representative of the Estate of Steven Bachar,

2

and at all times relevant hereto was a citizen of the United States and a resident of the State of Colorado.

11. At all times relevant hereto, Plaintiff Emily Bachar, daughter of decedent, was a citizen of the United States of America and a resident of the State of California.

12. At all times relevant hereto, Plaintiff Sarah Bachar, daughter of decedent, was a citizen of the United States of America and a resident of the District of Columbia.

13. Defendant Nurse Silmara Dos Santos is a Colorado Department of Corrections ("CDOC") employee and a Registered Nurse. At all times relevant to the subject matter of this litigation, Ms. Dos Santos was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Ms. Dos Santos was acting under color of state law in her capacity as a nurse for the CDOC and is sued for her deliberately indifferent actions in this capacity.

14. Defendant Nurse Supervisor Erin Hannesson Ruark is a Colorado Department of Corrections ("CDOC") employee and a Registered Nurse. At all times relevant to the subject matter of this litigation, Ms. Hannesson Ruark was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Ms. Hannesson Ruark was acting under color of state law in her capacity as a Nursing Supervisor for the CDOC and is sued for her deliberately indifferent actions in this capacity.

15. At all times relevant hereto, Defendant NP Jerry Williford was a citizen of the United States and a resident of Colorado. Defendant Williford was an agent, employee, and/or

3

subcontractor of Jackson & Coker[1] placed in CDOC and acting under color of state law. As Mr. Williford was employed by a private company, not a governmental agency, he is not entitled to qualified immunity.

## IV.  STATEMENT OF FACTS

16. Steven Bachar was only 58 years old when he died from an entirely preventable and painful cardiac emergency. At the time, he was incarcerated at RCC.

17. It was well-documented throughout Mr. Bachar's CDOC medical record that he had high blood pressure (hypertension), high cholesterol (hyperlipidemia), and a family history of coronary artery disease.

18. Prior to being incarcerated, Mr. Bachar had a coronary artery scan that showed he had calcification in his arteries – increasing his likelihood of heart attack or other major cardiac events.

19. During his intake exam, Mr. Bachar told CDOC medical staff about the calcification in his arteries. The CDOC provider noted these results in Mr. Bachar's CDOC medical chart, confirmed that he had hypertension and hyperlipidemia, and prescribed Lisinopril and Atorvastatin.

20. Mr. Bachar took his medications regularly, tried to eat a heart healthy diet, and went for daily runs on the track at RCC.

---

[1] Jackson & Coker Locumtenens, LLC, and Jackson Physician Search, LLC, f/k/a Jackson & Coker Permanent, LLC, are Georgia companies with a principal street address of 2655 Northwinds Parkway, Alpharetta, GA 30009. Their registered agent of service in Colorado is the Corporation Service Company, 1900 W. Littleton Blvd, Littleton, CO 80120. At all times relevant hereto, a Jackson & Coker company, doing business as Jackson + Coker Practitioner, LLC, employed Defendant Jerry Williford and contracted with CDOC to provide medical staffing services to inmates.

4

21. While Mr. Bachar was exercising on or around March 10, 2024, he started having chest pains and shortness of breath.

22. At approximately 9:30 in the morning on March 12, 2024, Mr. Bachar began feeling lightheaded and declared a medical emergency.

23. Mr. Bachar reported severe chest pain and shortness of breath to Nurse Silmara Dos Santos – obvious and well-known signs of a cardiac emergency. He explained to Nurse Dos Santos that he had started feeling lightheaded while running on the track the day before, that he routinely went for runs, and that he had never experienced these symptoms before.

24. Nurse Dos Santos reviewed Mr. Bachar's medical record and was thus aware that he was at high risk of suffering a major cardiac event as a 58-year-old man with hypertension, hyperlipidemia, calcification in his arteries, a family history of coronary artery disease, and had a change in condition with new cardiac symptoms.

25. When someone has chest pain, shortness of breath, and lightheadedness like Steven Bachar reported, they need to be immediately assessed to rule out cardiac involvement or sent to the hospital. All reasonable people know that any complaint of chest pain or shortness of breath be treated as a major medical emergency until such time as cardiac involvement has been ruled out by a Physician, Physician's Assistant or Nurse Practitioner.

26. As a trained medical professional, Nurse Dos Santos was aware that these are symptoms that indicate a potentially life-threatening condition, particularly in a patient with known cardiac risk factors, and that time is of the essence in cardiac emergencies.

27. Despite the obvious severity and life-threatening nature of Mr. Bachar's symptoms, Nurse Dos Santos did not immediately obtain an EKG or send Mr. Bachar to a hospital where an

EKG and other diagnostics could be timely performed.

28. Rather, she scheduled Mr. Bachar to have an EKG five hours later, at 2:30 pm, told him to submit a written request for medical attention ("kite") if his symptoms persisted or worsened, and sent him away.

29. Nurse Dos Santos performed an EKG that afternoon, which showed that Mr. Bachar's symptoms were, in fact, being caused by a serious cardiac emergency. Despite seeing these known abnormal EKG results, Nurse Dos Santos still did not send Mr. Bachar to the hospital for the emergency care he obviously required.

30. Defendant Dos Santos completely abdicated her gatekeeper role when she knowingly delayed Mr. Bachar's access to obviously needed medical care.

31. Nurse Practitioner Jerry Williford reviewed Mr. Bachar's abnormal EKG results at about 3:00 pm, and saw that Mr. Bachar had both a widened QRS and a right bundle branch block.

32. NP Williford was not on site at RCC, was working remotely, and knew that Mr. Bachar could not timely be seen by a doctor or nurse practitioner unless he was sent to the hospital. NP Williford also knew that RCC had no capacity to treat or prevent heart attacks or other serious cardiac issues. NP Williford knew that it was beyond the onsite medical staff's scope of practice to provide the care and treatment he needed because there were no providers onsite. He recklessly decided to keep Mr. Bachar at RCC without ever seeing or speaking to his patient, let alone performing a hands-on assessment.

33. NP Williford remotely reviewed Mr. Bachar's medical record, and charted that he did not have any earlier EKGs to compare. He was thus obligated to treat any abnormal findings, including the QRS prolongation and the right bundle branch block, as new developments and a

serious change in condition.

34. From his review of Mr. Bachar's medical record, NP Williford knew at the time he reviewed the EKG that Mr. Bachar had many cardiac risk factors including his age, sex, family medical history of heart disease, arterial calcification, hyperlipidemia, and hypertension.

35. As a trained medical professional, NP Williford knew at the time he reviewed the EKG results that these abnormalities were obvious, neon light emergency findings, and that Mr. Bachar would very likely experience a cardiac emergency without treatment.

36. NP Williford also knew at the time he reviewed the EKG that new onset right bundle branch block, especially in the context of Mr. Bachar's symptoms, arterial calcification, hyperlipidemia, hypertension, and family medical history, indicated he was very likely already experiencing a distressing, painful, and potentially life-threatening cardiac emergency.

37. As a trained medical professional NP Williford knew at the time he reviewed the EKG that a 58-year-old, symptomatic, male patient with new onset QRS prolongation, new onset right bundle branch block ("RBBB"), hypertension, hyperlipidemia, and a family history of coronary artery disease ("CAD") needs to be immediately hospitalized for a complete cardiac workup and treatment that far exceeded RCC's capabilities.

38. Defendant Williford charted that the abnormalities on Mr. Bachar's EKG were probably related to his hypertension. He was thus consciously aware that Mr. Bachar was experiencing a major change in condition, and that he was at a substantial risk of experiencing a major, potentially fatal cardiac event if not timely evaluated and treated at a hospital.

39. Despite knowing from the medical record that Mr. Bachar had several cardiac risk factors, and was at significant risk of suffering a life-threatening cardiac emergency, NP Williford

7

refused to send Mr. Bachar to the hospital where the underlying causes of the abnormal EKG could have been investigated, and where Mr. Bachar could have received timely, life-saving care.

40. Had Mr. Bachar been immediately hospitalized, his cardiac emergency would have been detected and his untimely death very likely prevented.

41. Rather than immediately send Mr. Bachar to the hospital for the higher-level evaluation and treatment he obviously required, NP Williford recklessly chose to keep Mr. Bachar at RCC, get some blood work, and follow up when the lab results were available.

42. At the time he decided to do nothing more than order routine labs, NP Williford was aware that it would take days to receive the results.

43. Despite knowing from his risk factors, symptoms, and abnormal EKG that Mr. Bachar faced a substantial risk of suffering a life-threatening cardiac event in the near future without intervention, NP Williford did not even order these labs "STAT" or include an order for a cardiac troponin test, which is integral to the assessment and diagnosis of patients with possible acute coronary syndromes.

44. NP Williford knew that ordering labs would not do anything to prevent Mr. Bachar from suffering a heart attack or other major cardiac event.

45. He recklessly did not even order serial EKGs, which would show progression of heart issues and was the only cardiac assessment tool available at RCC.

46. NP Williford consciously disregarded the substantial risk that Mr. Bachar was already in the throes of a life-threatening cardiac event and did not take any reasonable measures to eliminate cardiac causes of his symptoms or otherwise abate the harm. He completely abdicated his gatekeeper role in denying Mr. Bachar access to the hospital level care he obviously required.

8

47. Mr. Bachar returned to the medical unit the next day, March 13, 2024, to have his blood drawn by Nurse Dos Santos. Nursing Supervisor Erin Hannesson Ruark was also present, and had reviewed Mr. Bachar's medical record and was aware of its contents. He told Defendants Dos Santos and Hannesson Ruark that he was scared that he might die, and reported that he was still experiencing lightheadedness, shortness of breath, and chest tightness. He asked what the plan was, what his EKG showed, and when he could see a doctor.

48. Persistent chest pain or tightness, shortness of breath, and lightheadedness are widely known to be textbook symptoms of cardiac emergency. These symptoms are especially alarming in a patient like Mr. Bachar, who had diagnoses of hypertension and hyperlipidemia; a family history of heart disease; an abnormal EKG the day before; and ongoing serious symptoms of a cardiac emergency.

49. It is also obvious to lay people that chest pain and/or shortness of breath require immediate medical evaluation and attention. CDOC staff are trained and have a clear constitutional duty to immediately refer complaints of chest pain to a qualified medical professional.

50. Defendants Dos Santos and Hannesson Ruark are Registered Nurses who cannot diagnose or initiate treatment without a doctor's order. They are required by their licensure to report any abnormal nursing findings to a provider capable of diagnosing, and to escalate any patient who needs a diagnosis quickly, or whose needs are likely to exceed RCC's capabilities, to the hospital. Everyone, including Defendants Dos Santos and Hannesson Ruark, knows that a person with Mr. Bachar's risk factors, symptoms, complaints, and EKG results must be evaluated quickly by a doctor; not warehoused in a prison without any treatment or even monitoring.

51. Despite the obvious life-threatening nature of Bachar's symptoms, and although Nurses

9

Dos Santos and Hannesson Ruark knew that Mr. Bachar had already been experiencing these symptoms for days, they did not contact a doctor or send Mr. Bachar to the hospital for higher-level evaluation and treatment. Rather, Nurse Dos Santos instructed him to fill out a kite to schedule a follow-up appointment.

52. As nurses, Defendants Dos Santos and Hannesson Ruark were acting as gatekeepers to the level of care Mr. Bachar needed, and their denial of access to treatment worsened his suffering and caused his death.

53. On March 14, 2024, Mr. Bachar filled out a kite, as instructed, reporting that he had been experiencing more shortness of breath and chest tightness.

54. Nursing Supervisor Hannesson Ruark received and reviewed this kite. Again, rather than immediately sending Mr. Bachar to the emergency room, Ms. Hannesson Ruark recklessly and unilaterally determined that Mr. Bachar could wait 1-2 weeks to be seen.

55. She scheduled him to be seen by a provider on March 21, 2024 – a full week later.

56. Also on March 14, RCC medical staff, including Defendants Dos Santos and NP Williford, received and reviewed Mr. Bachar's lab results, which also contained abnormal results and further evidenced that Mr. Bachar was experiencing a serious change in condition and medical emergency that exceeded RCC's capabilities to treat. These Defendants again abdicated their gatekeeper duty in the face of this information.

57. Despite days of mounting evidence that Mr. Bachar was experiencing a heart issue which far exceeded the RCC's capability to evaluate and treat, nobody reacted at all to Mr. Bachar's abnormal lab results and other alarming signs of an imminent, potentially fatal, cardiac event.

10

58. All of the Defendants were consciously aware that Mr. Bachar needed to be urgently hospitalized, but none took any steps to send him to the emergency room. Rather, they disregarded Mr. Bachar's worsening condition, doing nothing as he deteriorated and continued to ask for help.

59. In doing so, Defendants were deliberately indifferent in their gatekeeping role, preventing Mr. Bachar from getting treatment for his known and obvious serious medical needs.

60. Tragically, Mr. Bachar died from treatable ischemic heart disease due to coronary artery atherosclerosis that night or in the early morning hours of March 15, 2024.

61. At approximately 6:15 am on March 15, 2024, two inmates found Mr. Bachar thrashing around and then slumping over and becoming unresponsive in his cell. One began performing CPR while the other alerted RCC staff. Mr. Bachar suffered a traumatic resuscitation effort, finally succumbing to death after receiving CPR for more than an hour and a half.

62. By ignoring Mr. Bachar's repeated requests for urgent medical attention, and numerous objective indicia that he was experiencing a cardiac emergency, these Defendants were deliberately indifferent. Despite presenting with textbook symptoms of a cardiac emergency and repeatedly requesting higher-level medical care, Defendants denied Mr. Bachar access to medical personnel and facilities capable of evaluating and treating his known serious medical condition.

63. By refusing to take urgent action, Defendants Dos Santos, Williford, and Hannesson Ruark, denied Mr. Bachar known and necessary medical treatment for his ongoing and fatal cardiac emergency, and prevented Mr. Bachar from getting to other medical providers who could help him, causing Mr. Bachar to suffer extreme fear and pain for hours on end and a preventable untimely death.

64. The Garfield County Coroner's Office confirmed on autopsy what Mr. Bachar had

reported on intake to the Department of Corrections – his arteries were badly occluded. Had he been hospitalized before March 15, 2024, this occlusion could have been promptly cleared or treated, and Mr. Bachar's death very likely avoided.

65. Further discovery may reveal other actors who received and ignored Mr. Bachar's numerous pleas for medical attention.

66. As a result of the conduct complained of herein, Mr. Bachar suffered several days of severe pain, distress, and, ultimately, death.

67. Prior to the events giving rise to his incarceration, Mr. Bachar was a successful attorney and member of the Denver business and political community. He was a voracious reader, avid outdoorsman, and proud veteran. He was quick witted and cared deeply about his country and local community.

68. During his incarceration, Mr. Bachar was a model inmate. He was sincerely committed to thinking deeply about his actions, the harm he caused, and how to realign himself with his best characteristics. He worked hard to right his past wrongs and find personal redemption – routinely writing his pastor, friends, and family members. He was an enthusiastic member of the RCC choir and had been approved for community corrections in the near future.

69. Most of all, Steven Bachar was a committed and loving father. Notwithstanding his incarceration, he remained a cherished member of a close-knit family. In addition to his many friends, Mr. Bachar left behind two loving daughters, Emily & Sarah, whom he spoke to daily:



70. Defendants Dos Santos, Hannesson Ruark, and Williford are jointly and severally liable for this continuous pattern of deliberately indifferent care and each Defendant, by their respective identified actions, significantly causally contributed to this entirely preventable death.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of 42 U.S.C. § 1983**
**Deliberately Indifferent Medical Care in Violation of the Eighth Amendment**
(Plaintiff Estate Against All Defendants)

71. Plaintiff Estate, through Susan Bachar as Personal Representative, hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

72. 42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in

13

equity, or other appropriate proceeding for redress . . .

73. Plaintiff is a citizen of the United States and Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

74. Mr. Bachar had a clearly established right under the Eighth Amendment to be free from deliberate indifference and reckless disregard for his known serious medical needs as well as from cruel and unusual punishment.

75. As of the time of Mr. Bachar's medical emergency, it was clearly established delaying or denying treatment to a patient with unexplained chest pain or other obvious symptoms of a potentially serious cardiac condition is deliberately indifferent.

76. Each Defendant was acting under color of state law at all times relevant hereto.

77. Each Defendant is individually liable to the Plaintiff for violation of 42 U.S.C. § 1983.

78. Each Defendant hereto recklessly and knowingly denied medical treatment for known serious medical injuries. Defendants hereto were also deliberately indifferent in delaying and denying Mr. Bachar transport to a medical facility to obtain higher-level medical care. None of the Defendants could treat a heart emergency on their own, and each had a constitutional obligation not to deny and delay transport to the appropriate level of medical provider for the injury.

79. Defendant Dos Santos was deliberately indifferent to Mr. Bachar's serious medical needs as described in the Statement of Facts.

80. Not only was the severity and life-threatening nature of Mr. Bachar's medical condition obvious, but Defendant Dos Santos was consciously aware that Mr. Bachar was experiencing lightheadedness, chest pain and shortness of breath. These are widely-known to be serious, life-threatening symptoms requiring urgent medical care. Defendant Dos Santos was further

14

consciously aware that Mr. Bachar's EKG was abnormal, and that RCC did not have the resources to further evaluate and treat Mr. Bachar's cardiac emergency. She nonetheless made no effort to get Mr. Bachar the emergency medical care he obviously required.

81. Even when she learned that Mr. Bachar's blood labs were also abnormal, Defendant Dos Santos completely abdicated her duties as a gatekeeper and made no effort to escalate Mr. Bachar to a hospital capable of treating him.

82. Defendant Williford was deliberately indifferent to Mr. Bachar's serious medical needs as described in the Statement of Facts.

83. Despite being consciously aware that Mr. Bachar's symptoms, EKG, and labs indicated that he was experiencing a cardiac emergency, and that RCC did not have equipment or personnel capable of evaluating and treating this cardiac emergency, Defendant Williford made absolutely no effort to get Mr. Bachar the medical care he obviously and desperately needed.

84. Defendant Hannesson Ruark was deliberately indifferent to Mr. Bachar's serious medical needs as described in the Statement of Facts.

85. Not only was the severity and life-threatening nature of Mr. Bachar's medical condition obvious, but Defendant Hannesson Ruark was consciously aware that Mr. Bachar was experiencing persistent lightheadedness, chest pain and shortness of breath. These are widely known to be serious, life-threatening symptoms requiring urgent medical care. Defendant Hannesson Ruark was further consciously aware that Mr. Bachar's EKG was abnormal, and that RCC did not have the resources to further evaluate and treat Mr. Bachar's cardiac emergency. She nonetheless made no effort to get Mr. Bachar the emergency medical care he obviously required.

86. Defendants Hannesson Ruark and Dos Santos were also aware that they were

15

prohibited by the scope of their license from diagnosing or ruling out serious causes for the symptoms that they knew Mr. Bachar was experiencing, and that no doctor was onsite to even evaluate Mr. Bachar, but recklessly arrogated to themselves the right to block his access to obviously needed specialized emergency treatment.

87. Defendants' actions indicate a willful and wanton disregard and deliberate indifference to Mr. Bachar's civil rights.

88. Defendants, as willful participants in a joint activity, actually knew of Mr. Bachar's serious medical needs and deteriorating condition and nonetheless, with deliberate indifference, decided not to send him to the hospital for obviously necessary urgent medical care. They did so despite being aware of Plaintiff's known serious medical needs and recklessly disregarding a substantial risk of physical harm and death.

89. It was clearly established at the time of Mr. Bachar's obviously life-threatening symptoms and test results that the complained of conduct in denying and delaying access to specialized emergency treatment is deliberately indifferent.

90. While Defendant Williford is not a governmental employee and therefore is not entitled to qualified immunity, his conduct was also clearly established at the time to be unconstitutional.

91. As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses, including the death of Mr. Bachar, entitling it to recover his compensatory and special damages, including for loss of constitutional rights, loss of enjoyment of life, pain and suffering, loss of relationships, and permanent lost earnings and earnings capacity for his expected productive working lifetime, all in amounts to be proven at trial.

92. Plaintiff Estate is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988,

16

prejudgment interest and costs as allowable by federal law.

93. In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against each Defendant under 42 U.S.C. § 1983, in that the actions of each of these Defendants were undertaken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

### SECOND CLAIM FOR RELIEF
### Wrongful Death
(Plaintiffs Emily Bachar & Sarah Bachar against Defendant Jerry Williford)

94. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

95. At all times relevant to this action, Mr. Bachar was under the medical responsibility, care, and treatment of Defendant Jerry Williford.

96. Defendant Williford had a duty to provide care to inmates at RCC, including Mr. Bachar.

97. Defendant Williford had nurse practitioner-patient relationship with Mr. Bachar and was acting within the scope of his employment.

98. With respect to the care and treatment of Mr. Bachar, Defendant Williford owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations. Through his actions and omissions, he breached the respective standards of care and was negligent in failing to properly assess, monitor, treat, and care for Mr. Bachar, despite the fact that he was in obvious need of immediate medical attention.

99. These duties of care are informed by state law. Under C.R.S. § 16-3-401,

17

"prisoners arrests or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

100.    As a direct and proximate result of these Defendants' unlawful acts and omissions, Plaintiffs Emily and Sarah Bachar have suffered damages, losses and injuries in an amount to be determined by the jury at trial. These damages include *inter* alia, upset, grief, loss of their father's companionship, impairment in the quality of their lives, anger, depression, lost earnings and financial benefits they would have reasonably been expected to receive from their father had he lived, and all other purely economic and non-economic damages under the Colorado Wrongful Death Act.

101.    Plaintiffs here to give notice that they may seek leave to amend the complaint to add a remedy of punitive damages on the state law claims upon completion of substantial discovery.

## VI.  PRAYER FOR RELIEF

Plaintiffs pray that this Court enter judgment for the Plaintiffs and against each of the Defendants and enter the following relief:

a.    All available compensatory, non-economic, consequential, special, including, but not limited to, for pain and suffering, physical, mental and emotional distress, loss of life, all other non-economic and economic damages available under the law;

b.    Punitive damages on all federal claims as allowed by law and in an amount to be determined at trial against individual Defendants;

18

c.    Attorneys' fees and costs;

d.    Pre- and post-judgment interest as appropriate; and

e.    Any further relief this Court deems just and proper.

**PLAINTIFFS REQUEST A TRIAL BY JURY.**

Respectfully submitted this 28th day of May, 2025.

*/s/ Rachel Kennedy*

Rachel Kennedy

Anna Holland Edwards

HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC

1437 High Street

Denver, CO  80218

303-860-1331

rachel@hheglaw.com
